UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VULCANIZE, INC.,                                     :

                              Plaintiff,             :      21 Civ. 06440 (PAE)

              - against -                            :      <u>FIRST AMENDED COMPLAINT</u>

BRANEFRAME, INC., RICH BURDON,                       :      <u>JURY TRIAL DEMANDED</u>
DXOS FOUNDATION, MARCUS RYU,
and WIRELINE, INC.,                                  :

                              Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Vulcanize, Inc., by its attorneys identified below, for its first amended

complaint against defendants Braneframe, Inc., Rich Burdon, DXOS Foundation, Marcus Ryu, and

Wireline, Inc., alleges and states as follows:

### Nature of the Action

        1.      This is an action for intentional copyright infringement, for unfair

competition, for unjust enrichment, for conversion, and for breach of contract.  The action is also

to establish by declaratory judgment that defendants Braneframe, Inc. and DXOS Foundation, as

successors to defendant Wireline, Inc., are liable for the breaches of contract and tortious

conduct of defendant Wireline, Inc., and to prove that defendants Rich Burdon and Marcus Ryu

are liable not only for direct commission of torts and breaches of quasi-contract but also for

aiding and abetting the other defendants in their wrongdoing.

        2.      The action seeks (a) to recover damages for copyright infringement in the

form of lost profits and in the form of value conferred on defendants by reason of their

infringement, both in an amount to be determined, together with statutory damages and

attorney's fees and costs as provided by applicable statute, (b) preliminary and permanent injunctive relief to restrain defendants from infringing plaintiff's registered copyrights, (c) to recover such compensatory and punitive damages as may be warranted for common or state law unfair competition, (d) to recover such compensatory and punitive damages as may be warranted for common or state law unjust enrichment but in no event less than the sum of approximately $300,000, (e) to recover such compensatory and punitive damages as may be warranted for common or state law conversion, but in no event less than the sum of approximately $300,000, (f) to recover such compensatory damages as may be warranted for breach of contract but in no event less than the sum of approximately $300,000, and (g) to establish that defendants Braneframe and DXOS Foundation are successor entities to defendant Wireline and that they and the individual defendants are liable for Wireline's debts and obligations in tort and contract, and to obtain a declaratory judgment to this effect.

3.     The claims arise from defendants' intentional infringement of plaintiff's copyrighted work, as more particularly described below, and from a business relationship between plaintiff and defendants in which defendants committed various federal and common and state law violations of law.

**Jurisdiction**

4.     The jurisdiction of this Court over the action rests upon:

(a) 28 U.S.C. §1331 (federal question)—in that the action arises under the laws of the United States;

(b) 28 U.S.C. §1338(a) (copyrights)—in that the action arises under an Act of Congress relating to copyrights;

(c) 28 U.S.C. §1367 (supplemental jurisdiction)—in that the common law claims that are set forth in this complaint are so related to claims in the action within

the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution; and

**Parties**

5.      Plaintiff Vulcanize, Inc. ("Vulcanize"), is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located in New York, New York.  The principal of Vulcanize is Rick Dudley.

6.      Defendant Braneframe, Inc. ("Braneframe"), is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located in New York, New York.

7.      Defendant Rich Burdon ("Burdon") is a citizen or subject of the United Kingdom lawfully residing in Brooklyn, New York.

8.      Defendant DXOS Foundation ("DXOS") purports to be a non-profit organized and existing under the laws of the Nation of Switzerland.

9.      Defendant Marcus Ryu ("Ryu") is a citizen of the State of California residing in San Francisco, California.

10.      Defendant Wireline, Inc. ("Wireline"), is a corporation duly organized and existing under the laws of the State of Delaware that maintained or maintains a principal place of business located in New York City, New York.

**Facts**

**Plaintiff Vulcanize**

11.      Plaintiff Vulcanize is a consultancy whose focus is the development of complex and novel software systems.  Among other things, Vulcanize designs and advises on the development of complex systems using blockchain technology.

12.    Vulcanize is the exclusive owner of all right, title, and interest in the following federally-registered copyrights (the "Copyrighted Work(s)").  Certificates of Registration issued by the U.S. Copyright Office for each, followed by the respective Copyrighted Work, are attached to this first amended complaint as Exhibits A-I:

    a.  WPS Quick Spec, Registration Number TX 8-966-577;[1]

    b.  Wireline Whitepaper, Registration Number TX 8-966-579;

    c.  Vulcanize–Wireline Registry Mechanism, Registration Number TX 8-966-581;[2]0

    d.  Wireline Payments Network, Registration Number TX 8-966-588;

    e.  Wireline Issuance, Registration Number TX 8-966-600;

    f.  Wes Notes, Registration Number TX 8-966-603;

    g.  Vulcanize Design Mechanism, Registration Number TX 8-966-608;[3]

    h.  Introduction to the Wireline Network Mechanism and Economics, Registration Number TX 8-966-613;

    i.  Critical Path Proposals for DxOS, Registration Number TX 8-966-617.

---

[1] "WPS" refers to Wireline Payments Service, an alternate name for Wireline Payments Network.

[2] A registry is a database of information, settings, options, and other values for software.

[3] Mechanism design, an important tool in microeconomics, has widespread applications in modelling and solving decentralized design problems in many branches of engineering, notably computer science, electronic commerce, and network economics.  Mechanism design is concerned with settings where a social planner faces the problem of aggregating the announced preferences of multiple agents into a collective decision when the agents exhibit strategic behavior.  The objective of the whitepaper referenced in the text of this pleading above is to provide a tutorial introduction to the foundations and key results in mechanism design theory.

**The Defendants**

13.     Defendant Burdon was formerly the chief executive officer of Wireline and was its majority owner.

14.     Defendant Ryu worked in some capacity with Wireline or with Burdon. Plaintiff lacks knowledge as to whether he was an agent or employee of Wireline, although Burdon introduced Ryu to Vulcanize and asked Vulcanize to work with him on their project, and Ryu held himself out as acting on behalf of Wireline.

15.     Wireline was formed on or about December 8, 2017, and had its principal place of business in New York, New York.

16.     Wireline publicly described itself as an early-stage company focused on the development of a decentralized, blockchain-based platform for "microservices" applications.[4]  As alleged below, Wireline unlawfully offered and sold securities—in the form of  simple agreements for future tokens (or SAFTs)—that were not registered in accordance with the U.S. federal securities laws.[5]  Wireline also proposed and promised to use such future tokens as consideration for services it required and for which it contracted with Vulcanize.[6]

17.     Wireline Developer Fund Ltd., a/k/a Wireline Developer Fund ("Wireline Developer Fund") is a Cayman Islands entity formed in 2017 and a wholly-owned subsidiary of

---

[4] Microservices are a method of developing software applications which are made up of independently deployable, modular services.  Each microservice runs a unique process and communicates through a well-defined, lightweight protocol, to serve a business objective.

[5] A SAFT is a contractual investment agreement in the domain of cryptocurrencies between project operators and their authorized investors.  Typically, a SAFT is used to finance the crypto developers' projects in exchange for discounted crypto tokens at a future date.

[6] A token is an asset defined by data stored on a blockchain.  A smart contract contains the ledger of token balances.  The smart contract is also used to restrict the transfer of tokens between persons or entities.

Wireline.  Wireline Developer Fund was formed for the purpose both of distributing the Wireline tokens and encouraging the utilization of tokens in the Wireline platform or marketplace.

18.     Predicated on its own description of itself, defendant Braneframe is "a Web3 company building peer-to-peer privacy-preserving applications on open-source protocols, most importantly a fully decentralized database," and claims to be "a leading project in the DXOS (Decentralized Operating System) ecosystem, whose participants are working toward an alternative to the tech giant-dominated public cloud."  Defendants Burdon and Ryu are the co-founders and owners of defendant Braneframe.

19.     Defendant DXOS purports to be a foundation existing under the laws of the Nation of Switzerland and a non-profit entity.  Defendant Burdon, and perhaps defendant Ryu,  created and organized DXOS, ostensibly to serve as the conduit for tokens to be delivered to investors in Wireline and Braneframe, as more fully described below.  DXOS conducts business activities in both New York State and California.

<strong>The Advisory Services Agreements</strong>

20.     By three separate written advisory services agreements (collectively, the "Advisory Services Agreements"), respectively effective July 24, 2018, June 25, 2019, and April 16, 2020, Vulcanize and defendant Wireline entered into and memorialized an advisory relationship for the purpose of Vulcanize providing system architecture and design services to Wireline.  The first two such agreements were executed by the parties; the third was unexecuted but the parties nonetheless conducted business in accordance with its terms.  Each agreement amended and restated the preceding agreement.  The agreements are attached hereto, respectively, as Exhibits J, K, and L.  Each of the Advisory Services Agreements contained identical (or virtually identical) standard terms and

conditions and an Exhibit J (stipulating compensation) that was expressly incorporated into and made part of each agreement.

21.     Under the July 24, 2018, advisory services agreement, the parties described the specific services that Wireline required of Vulcanize (characterized as the "Advisory Services") as follows:

> Advisor shall be responsible for advising Client on the token mechanism design for the Wireline platform. Advisor shall perform the Advisory Services through Principal for up to 5 hours.[7]
>
>         *          *          *
>
> Deliveries under this Agreement are to be made to a public GitHub repo licensed with GPLv3, BSD, MIT or equivalent.[8]

22.     Under the June 25, 2019 advisory services agreement, the parties described the specific Advisory Services that Wireline required of Vulcanize as follows:

> Advisor shall be responsible for advising, assisting and supporting Client on the design of the Wireline Network, Wireline Decentralized Registry, and other Wireline Products, including mechanism design consulting and systems architecture consulting. Mechanism design consulting includes design of BFT protocols, network specifications, token economies, consensus mechanisms, governance mechanisms, and positive/negative incentives. Systems architecture consulting includes sidechain technical architecture,

---

[7] Token Mechanism Design refers to the set of rules and restrictions applied to the issuance, creation, transference, and destruction of tokens within a given system.  The restrictions are created with the goal of incentivizing some set of economic activities within the system as well as for the purpose of mediating activities between a given system and other systems.

[8] GPLv3, BSD, MIT or equivalent refer to common "Open Source" licenses.  Vulcanize sought to avoid any reference to a "creative commons" license, a license that is usually applied to non-code copywrited works, because its restrictions did not provide it sufficient protections.  GPLv3, which was enumerated as a permissible license in the Advisory Services Agreements, is in contrast a license with onerous restrictions on use.

> payments scaling solutions, token exchange, two-way pegs, and
> atomic swaps.
>
> *          *          *
>
> "Deliverables" as defined under Section 3 of the Standard Terms
> and Conditions of this Agreement include without limitation a
> mechanism requirements document, a detailed technical design, a
> mechanism white paper for external peer review, and ongoing
> consulting with technical teams. Deliveries under this Agreement
> are to be made to a public GitHub repo licensed with GPLv3, BSD,
> MIT or equivalent.

23.     Under the April 16, 2020, Advisory Services Agreement, the parties described
the specific Advisory Services that Wireline required of Vulcanize as follows:

> Advisor shall be responsible for advising, assisting and supporting
> Client on the design of the Wireline Network, Wireline Name Service,
> and other Wireline Products, including mechanism design consulting,
> systems architecture consulting, and other works. Mechanism design
> consulting includes design of BFT protocols, network specifications,
> token economies, consensus mechanisms, governance mechanisms,
> and positive/negative incentives. Systems architecture consulting
> includes sidechain technical architecture, payments scaling solutions,
> token exchange, two-way pegs, and atomic swaps. Other works
> includes Development of the Wireline and DxOS systems,
> management of developers, whitepaper and other forms of non-
> proprietary writing as needed.

24.     Under paragraph 5 of the Standard Terms and Conditions incorporated and
made a part of each of the Advisory Services Agreements, the parties covenanted that "[n]one of the
rights (including any copyrights) and title to Deliverables under this Agreement shall be considered
works made for hire, whether Deliverables are in digital or tangible form, and regardless of the
medium in which Deliverables are expressed."

25.     Under the Advisory Services Agreements, Vulcanize would be compensated
for providing its services and its deliverables in several ways.

26.     Under the July 24, 2018 (Ex. B) advisory services agreement, Vulcanize was to be compensated by cash payments for the work of its principal at an hourly rate of $480 per hour.

27.     Under the June 25, 2019 (Ex. C) advisory services agreement, Vulcanize was to be compensated by cash payments for the work of its principal at an hourly rate of $480 per hour, but half of such compensation was to be paid through deferred compensation in the form of ERC20-compliant tokens,[9] a form of crypto asset, to be delivered at the "Token Genesis Event," described in the agreement as Wireline's issuance and sale of such tokens using the Ethereum blockchain network. Additionally under this agreement, Wireline granted Vulcanize deferred compensation in the amount of $75,000, also in the form of tokens.

28.     Under the April 16, 2020, advisory services agreement (Ex. D), Vulcanize was to be compensated by a monthly fee of $32,000, consisting of $16,000 in cash and $16,000 in deferred compensation in the form of tokens, as described under the June 25, 2019, advisory services agreement.

29.     Notwithstanding the foregoing, if Wireline terminated either of the last two Advisory Services Agreements without cause, Vulcanize at its sole election could demand cash payment equivalent to the tokens then due.

30.     Vulcanized duly performed the services described in and required by the April 16, 2020, advisory services agreement and by the preceding two Advisory Services Agreements except as excused by act or omission of Wireline.  For those services, Wireline had paid Vulcanize the

---

[9] "ERC20" is a Standard used in the Ethereum ecosystem for defining tokens.  Using the standard makes it easier for different pieces of software to interoperate.  ERC stands for Ethereum Request for Comment, and 20 is the proposal identifier.  This token standard defines a set of rules that apply to all ERC20 tokens and allow them to interact seamlessly with other systems in which tokens conform to the standard.

sum of approximately $341,000.  Wireline owed Vulcanize the sum of $299,400 in deferred compensation.

31.     By refusing and failing to compensate Vulcanize in accordance with the Advisory Services Agreements, defendants obtained for themselves the licenses allowing use of the Copyrighted Works without paying therefor.

32.     The licenses granted to defendants under the Advisory Services Agreements are accordingly invalid.   Defendants may not continue to use them and have no licensed rights.

**Defendants' Violations of the Federal Securities Laws**

33.     Between January and September 2018, Wireline conducted a multi-phase securities offering through which it raised over $16.3 million (the "Offering") from public investors. Specifically, Wireline offered and sold securities in the form of investment contracts within the meaning of 15 U.S.C. §78c(10) when it offered and sold digital assets through simple agreements for future tokens (SAFTs).  The SAFTs provided that upon the public release of Wireline's marketplace, Wireline would distribute those digital tokens to its investors, who were counterparties to the SAFTs.

34.     Wireline represented to investors that invested funds would be used to develop the Wireline microservices platform and that the tokens would be used as the means of exchange between software developers and end-users on Wireline's marketplace.  The securities offering was not registered pursuant to the federal securities laws, and the offer and sale did not qualify for an exemption from federal securities registration requirements.  Wireline never distributed the digital tokens to investors.

35.     On January 15, 2021, the U.S. Securities and Exchange Commission ("SEC") entered an order against Wireline instituting cease-and-desist proceedings pursuant to Section 8(a) of the Securities Act of 1933, 15 U.S.C. §77a *et seq*. (the "Securities Act"), making findings, and

imposing penalties on, and a cease-and-desist order against, Wireline.  A copy of the order is attached to this first amended complaint as Exhibit M.

36.     In brief, the SEC found that Wireline had violated Section 5(a) and Section 5(c) of the Securities Act by offering and selling securities without a registration statement filed or in effect with the SEC or qualifying for an exemption from registration, and had violated Sections 17(a)(2) and (3) of the Securities Act—its antifraud provisions—with respect to the Offering by making materially false and misleading statements about the viability of its platform and the timetable for the issuance of its tokens.  The SEC based the latter finding on its conclusion that:

> [i]n connection with its securities offering, Wireline falsely asserted that more than 100 developers were publishing applications to its marketplace, that its platform had been functioning in "private beta" for more than nine months, and that the token distribution was imminent.  These statements materially misrepresented Wireline's functionality and progress, and more than two years since it made these statements, Wireline's platform has not launched.

37.     The SEC accordingly entered its order directing Wireline to cease and desist from its acts and omissions violative of the federal securities laws, to pay a civil penalty in the amount of $650,000 to be used for the creation of a "Fair Fund" under Section 308(a) of the Sarbanes-Oxley Act of 2002, to notify its investors of its violations of law, to notify investors that it would not distribute tokens pursuant to the SAFTs investors held, and to provide notice of the SEC order on its website.

38.     Wireline's serious wrongdoing—its unlawful conduct under federal law— effectively put an end to its business.  It ceased active business operations at some time in the Spring of 2021 and authorized the filing of a certificate of dissolution with the Delaware Secretary of State on March 26, 2021.

**The Putative Creation of DXOS Foundation**

39.     At a time during Vulcanize's association with Wireline (and with Burdon and Ryu), Burdon purported to create defendant DXOS Foundation, purportedly a Swiss non-profit entity.

40.     Burdon did this for the purpose, among others, of delivering tokens to the investors that had been defrauded by Wireline, as described by the SEC in its findings.

### Termination of the Vulcanize Advisory Services Agreement

41.     Having ceased to operate as an active business and by operation of law, Wireline effected the termination or constructive termination of the then-governing advisory services agreement or agreements between it and Vulcanize without cause, and triggered Vulcanize's right to demand payment of compensation, either current or deferred, in cash.

42.     At that time, Wireline was indebted to Vulcanize in the amount of $299,400. Despite due demand upon Wireline that it pay that amount to Vulcanize in cash, Wireline has failed and refused to make that payment.

43.     Wireline has also stated that it operated under a cost-plus service contract with the Cayman entity, Wireline Developer Fund described above in paragraph 17 of this first amended complaint, and that the latter held all assets and paid Wireline for Wireline's services.

44.     Wireline has further stated and represented that Wireline Developer Fund was the recipient of the proceeds of the unlawful securities offering described above, and that Wireline Developer Fund is currently in a court-ordered Cayman Islands dissolution proceeding.

45.     According to Wireline's representatives, it is without assets sufficient to pay its creditors, including Vulcanize.

### Formation of Braneframe

46.     On March 24, 2021, defendants Burdon and Ryu incorporated defendant Braneframe.

47.     Under the Advisory Services Agreements, the architecture and design work, together with associated software, performed by Vulcanize for Wireline was to be "open-source,"[10] and delivery was to be made to a publicly accessible, open-source software repository (repo) known as GitHub.

48.     In software development parlance affecting the GitHub repo, a "commit," or "revision" is an individual change to a file (or set of files).  The commit creates a unique ID (a/k/a the "HA" or "hash") that keeps a record of what changes were made when, and by whom they were made.

49.     Work committed to a public, open-source repository may be used, copied, and modified despite registered copyright, subject to conditions stipulated in licenses applicable under the repo.

50.     In the Advisory Services Agreements, Wireline and Vulcanize stipulated that the licenses permitting use, copying, and modification of the Vulcanize Copyrighted Work were to be "GPLv3, BSD, MIT or equivalent."  Under either of these licenses, use of the Copyrighted Work requires that the user make the work publicly available and preserve the authorship attribution of any derivative works.  In this context, "publicly available" would include code repositories (repos) such as https://github.com/dxos/dxns (last visited September 3, 2021), and such repos would be required to reference or link to the original Copyrighted Work.

**Access to the Copyrighted Work**

---

[10] Open-source software is software that is released under a license in which the copyright holder grants users the rights to use, study, modify, and distribute the software and its source code to anyone and for any purpose.  Open-source software may be developed in a collaborative public manner.  Notwithstanding that it is publicly accessible, users must comply with the applicable license.

51.     Vulcanize duly delivered the "deliverables" called for in the Advisory Services Agreements.  Among those deliverables were the copyrighted materials, or the Copyrighted Work, identified above in paragraph 10 of this first amended complaint.

52.     Wireline, as well as defendants Burdon and Ryu, through their association with Wireline as well as their collaboration with Vulcanize, had access to the Copyrighted Work.

53.     Defendant Braneframe had access to the Copyrighted Work through its association with defendants Burdon and Ryu.

## Infringement of the Copyrighted Work

54.     Defendants Burdon and Ryu, on behalf of defendant Braneframe and defendant DXOS, modified portions of the architecture and design developed by Vulcanize, together with associated software code, in the public GitHub repository, to disguise its source and distinguish it from the work originally designed by Vulcanize.  Modification of this work is not attributed to Vulcanize, as required by the applicable licenses.

55.     Defendants made such modifications without Vulcanize's authorization, consent, or knowledge, and without payment to Vulcanize.

56.     The Advisory Services Agreements express or imply a promise that Wireline, and accordingly its owners, affiliates, agents, and persons acting under it, such as Burdon, Ryu, Braneframe and DXOS, would not access or use the Copyrighted Material, including all materials deposited in the GitHub repo pursuant to such agreements, without appropriately compensating Vulcanize.

57.     Defendants Burdon, Ryu, Braneframe, and DXOS are using the design, architecture,  and coding, including the Copyrighted Work, developed by Vulcanize in connection

14

with the business and activities of Braneframe and in other contexts.  This use has benefitted those defendants at the expense of Vulcanize.

## FIRST CLAIM FOR RELIEF
### As Against All Defendants
### (Intentional Copyright Infringement—Damages)

58.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

59.     The Copyrighted Work is an original work containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. §101, *et seq*.

60.     Plaintiff is the exclusive owner of rights under copyright in and to the copyrighted work and owns a valid copyright registration for the Copyrighted Work.

61.     By reason of the foregoing, including the reproduction and use of the Copyrighted Work or any work derivative thereof, defendants have violated 17 U.S.C. §501 and have injured Vulcanize.

62.     Defendants' conduct was and continues to be willful and with full knowledge of plaintiff's rights in the Copyrighted Work.

63.     Vulcanize is entitled to recover of these defendants such damages, including lost profits, license fees, the value of defendants' misappropriation through infringement of copyright of Vulcanize's property rights, and statutory damages if applicable, together with attorney's fees and costs as are authorized under 17 U.S.C. §§504 and 505 and provided for by contract.

**SECOND CLAIM FOR RELIEF**
**As Against All Defendants**
**(Intentional Copyright Infringement—Injunctive Relief)**

64.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

65.     By reason of the foregoing, the defendants have violated 17 U.S.C. §501, have injured Vulcanize, and are continuing to violate that statute to Vulcanize's continuing injury.

66.     Defendants will persist in such unlawful conduct unless enjoined by this Court.

67.     By reason of these defendants' continuing infliction of injury on Vulcanize, Vulcanize has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

68.     Vulcanize is entitled to preliminary and permanent injunctive relief restraining and enjoining these defendants' ongoing infringing conduct, including without limitation, editing the materials in the GitHub repo so as to make their attribution to Vulcanize plain, and otherwise.

**THIRD CLAIM FOR RELIEF**
**As Against All Defendants**
**(Unfair Competition—Damages)**

69.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

70.     The foregoing conduct on the part of defendants evidences bad faith in that such defendants, having been acting under or in connection with valid and enforceable contracts between Vulcanize and Wireline, have deliberately breached those agreements and

appropriated to themselves the fruits of that contract created by Vulcanize while failing and refusing to pay for such fruits.

71.     By reason of the foregoing, defendants have engaged in unfair competition, to Vulcanize's injury and harm.

72.     Vulcanize is entitled to recover damages for such wrongful acts.

### FOURTH CLAIM FOR RELIEF
### As Against All Defendants
### (Unjust Enrichment—Damages)

73.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

74.     There was and there is no express contractual relationship between Vulcanize and the defendants other than Wireline.

75.     By diverting plaintiff's software architecture and design code to their use, defendants have acted unlawfully, inequitably, and unfairly.

76.     These defendants have acted to enrich themselves, and in doing so have appropriated and arrogated for themselves and for their personal use property that does not belong to them but belongs to Vulcanize.

77.     The architecture and design of the software and ecosystem that Braneframe and DXOS are now using was the result of Vulcanize's efforts, and Vulcanize has not been compensated therefor.

78.     Accordingly, this enrichment was at plaintiff's expense.

79.     Equity and good conscience militate against permitting defendants to retain such enrichment.

80.     Plaintiff is accordingly entitled to recover such enrichment from defendants in an amount to be determined by the trier of fact but no less than the amount of $300,000, representing the amount by which defendants have been enriched.

## FIFTH CLAIM FOR RELIEF
### As Against Braneframe, DXOS, Burdon, and Ryu
### (Conversion—Damages)

81.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

82.     In appropriating and arrogating to their use the property of Vulcanize, the defendants named in this claim for relief committed the tort of conversion.

83.     Vulcanize is entitled to appropriate damages therefor.

## SIXTH CLAIM FOR RELIEF
### As Against Wireline
### (Breach of Contract—Damages)

84.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

85.     By reason of the foregoing, defendant Wireline breached the Advisory Services Agreements.

86.     Vulcanize has been injured by such breach and is entitled to recover damages therefor.

## SIXTH CLAIM FOR RELIEF
### As Against Braneframe and DXOS
### (Successor Liability for Breach of Contract and Tort—Declaratory Judgment)

87.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

88.     The foregoing establishes that Braneframe and DXOS are successor corporations or entities to Wireline.

89.     The essential elements of a claim for successor liability has been met in that Braneframe and DXOS are mere continuations of Wireline and the transaction by which defendants Ryu and Burdon engineered the transfer of Wireline's valuable intellectual property assets (created and owned by Vulcanize) to Braneframe and DXOS was entered into fraudulently to escape such obligations.

90.     By reason of the foregoing, defendants Braneframe and DXOS are liable in contract and in tort for, respectively, the breaches of contract by Wireline and the torts committed by Wireline.

91.     Vulcanize has been injured by such breaches and by such tortious conduct and is entitled to recover both compensatory and punitive damages therefor as may be warranted.

92.     There is an actual and concrete controversy between Vulcanize, on the one hand, and defendants, on the other hand, as to whether Braneframe is a successor corporation to Wireline.

93.     It will aid the parties in the governance of their affairs to settle such controversy by determining that Braneframe are DXOS, respectively, are in fact a successor corporation and a successor entity.

94.     As an alternative to damages for successor liability, Vulcanize seeks a declaratory judgment, pursuant to 28 U.S.C. §§2201 and 2202, declaring that Braneframe and DXOS are, respectively, a successor corporation and successor entity to Wireline and liable for its debts and obligations in both contract and tort, and granting such other and further relief as may be appropriate and just in the circumstances.

19

## SEVENTH CLAIM FOR RELIEF
### As Against Burdon and Ryu
### (Aiding and Abetting Tortious or Similar Misconduct—Damages)

95.     Plaintiff Vulcanize repeats and realleges here the allegations of the foregoing paragraphs of this first amended complaint as if fully set forth at length.

96.     Defendants Burdon and Ryu aided and abetted defendants Wireline and DXOS in the commission of the torts of conversion and unfair competition and aided and abetted the same defendants to unjustly enrich themselves at the expense and to the detriment of plaintiff Vulcanize.

97.      Defendants Burdon and Ryu had knowledge of such wrongful conduct and rendered aid and assistance in its commission.

98.     By reason of the foregoing, defendants Burdon and Ryu aided and abetted defendants Wireline and DXOS in the commission of tortious and similar misconduct.

WHEREFORE, plaintiff Vulcanize demands judgment (a) for such compensatory and punitive money damages as the Court or the trier of fact may find proven, (b) for such preliminary and permanent injunctive relief as the Court may deem warranted, (c) for a constructive trust with respect to property of plaintiff being used by defendants, and (d) for a declaration that defendants Braneframe, Inc. and DXOS Foundation, as successors to defendant Wireline, Inc., are liable for the breaches of contract and quasi-contract and for the tortious conduct of defendant Wireline, Inc., together with appropriate prejudgment interest and the costs

and disbursements of this action including reasonable legal fees pursuant to contract and

otherwise.

Dated: Cornwall-on-Hudson, New York
   September 3, 2021

        KARLINSKY LLC

       By: /s/ Martin E. Karlinsky
         Martin E. Karlinsky, Esq.
         Bonnie H. Walker, Esq.
       103 Mountain Road
       Cornwall-on-Hudson, New York 12520
       (646) 437-1430
       martin.karlinsky@karlinskyllc.com
       bonnie.walker@karlinskyllc.com

       *Attorneys for Plaintiff*