# EXHIBIT M

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 10920 / January 15, 2021

**ADMINISTRATIVE PROCEEDING**
File No. 3-20206

| | |
|---|---|
| **In the Matter of**<br><br>**WIRELINE, INC.**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS AND IMPOSING PENALTIES AND A CEASE-AND-DESIST-ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") against Wireline, Inc. ("Wireline" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("the Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings and Imposing Penalties and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Summary

1.	Between January and September 2018, Wireline, an early-stage project focused on the development of a decentralized, blockchain based platform for "microservices" applications, conducted a multi-phase securities offering through which it raised over $16.3 million (the "Offering"). Wireline offered and sold securities in the form of investment contracts when it offered and sold digital assets through simple agreements for future tokens ("SAFTs"). The SAFTs provided that upon the public release of Wireline's marketplace, Wireline would distribute those digital tokens to investors, who were counterparties to the SAFTs. Wireline represented to investors that the funds would be used to develop the Wireline microservices platform and that the tokens would be used as the means of exchange between software developers and end-users on Wireline's marketplace. The Offering was not registered pursuant to the federal securities laws, and the offer and sale did not qualify for an exemption from the registration requirements. Wireline never distributed the digital tokens to investors.

2.	Based on the facts and circumstances set forth below, the digital tokens offered and sold by Wireline through SAFTs were offered and sold as investment contracts, and were therefore securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934*: The DAO (Exchange Act Rel. No. 81207) (July 25, 2017) (the "DAO Report"). Wireline sold investment contracts in exchange for the investment of money or other contributions of value, including other digital assets. A purchaser in Wireline's Offering had a reasonable expectation of obtaining a future profit based upon the efforts of others. More specifically, purchasers reasonably expected Wireline and its management to make efforts to develop the Wireline platform and create demand and market appreciation for the Wireline tokens, which had no consumptive use at the time of the Offering. Wireline violated Section 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration.

3.	Wireline also violated the antifraud provisions of the federal securities laws with respect to the offering by making materially false and misleading statements about the viability of its platform and the timetable for the issuance of the tokens. In connection with its securities offering, Wireline falsely asserted that more than 100 developers were publishing applications to its marketplace, that its platform had been functioning in "private beta" for more than nine months, and that the token distribution was imminent. These statements materially misrepresented Wireline's functionality and progress, and more than two years since it made these statements, Wireline's platform has not launched. As a result, Wireline violated Sections 17(a)(2) and (3) of the Securities Act.

## Respondent

4.	<u>Wireline, Inc.</u> is a Delaware corporation formed on or about December 8, 2017 with its principal place of business in New York, New York. Neither Wireline nor its securities are registered with the Commission.

**Other Relevant Entity**

5.     **Wireline Developer Fund Ltd., aka Wireline Development Fund** ("WDF"), a Cayman Islands entity formed in 2017, is a wholly-owned subsidiary of Wireline, created for the purpose of distributing the Wireline tokens and encouraging the utilization of tokens in the Wireline platform or marketplace.

**Facts**

**Background**

6.     In the spring and summer of 2017, a predecessor to Wireline began early-stage development of an open-source microservices platform for enterprise information technology solutions.  As part of the preliminary efforts to develop the platform, the predecessor developed components of an online marketplace and hired a number of freelance programmers to test and review aspects of the platform's underlying computer code and to develop microservice components through the platform.  The predecessor also created marketing documents that described the microservices platform concept and introduced the trade name "Wireline." By the fall of 2017, the predecessor's efforts had not produced a prototype consistent with what was described in its marketing documents, and further development had been transitioned to a new engineering team tasked with redesigning the platform's architecture.

7.     Beginning in October 2017, Wireline's predecessor engaged with new business partners who, together with the predecessor, formally created Wireline in December 2017 with the intent of developing a microservices platform modeled on the predecessor's initial concept. Although Wireline's business model shared many of the same basic ideas with the predecessor's, Wireline redesigned its platform, without utilizing the computer code of the predecessor entity.

**Wireline Offers and Sells Investment Contracts**

8.     Beginning in December 2017, Wireline solicited seed investors in a self-described "friends and family" round of the multi-phased Offering through an email to a large number of people, many of whom were not well known to Wireline.  The offering lasted through 2018. Wireline's offering raised a total of $16,325,000 from 28 investors ("the "Investors"), including some based in the United States.

9.     Each of the Investors in the Offering executed SAFTs between December 20, 2017 and September 24, 2018.  The SAFTs described the purchasers of the Wireline tokens as purchasing the "right to certain units of WRL of [Wireline or WDF]" upon the public release of a software-based marketplace enabling the buying and selling of computer services using tokens, which was described as the "Network Launch" date.  Wireline contemplated that the digital tokens would be used on Wireline's platform as the unit of account in transactions between developers and end-users.

10.    Most of Wireline's Investors were not projected to be developers or end-users of Wireline's to be developed platform.  The digital tokens being purchased through the Offering had

3

value only to the extent that Wireline successfully launched its network and created liquidity for the digital tokens to allow investors to monetize their investment. In marketing the Offering, Wireline committed to take steps to ensure market stability for the digital tokens and made assurances about the tokens' future liquidity, stating that the digital tokens would be tradeable on a third-party platform.

11. The SAFTs included a representation that the Investors had no intent to use or consume the tokens and that the Investor's sole purpose was to realize profits from purchasing the tokens at a discount. The SAFTs also indicated that they were generally unassignable.

12. Although the SAFTs included a representation that the Investors were "accredited," as that term is defined under the federal securities laws, for purposes of Wireline's attempted compliance with Regulation D of the Securities Act, Wireline took insufficient steps to verify the accredited status of Investors or otherwise assess their financial sophistication.

13. Investors executed a SAFT with Wireline or WDF. Notwithstanding the fact that Wireline was the party to many of the SAFTs, Wireline contemplated that WDF would be the entity that distributed the tokens to the Investors.

14. Wireline and WDF collectively filed three Forms D with the Commission. One was filed in the name of Wireline, Inc. and the other two were filed under the name Wireline Developer Fund and Wireline Development Fund. Wireline, however, only contemplated the release of one token, from WDF.

15. All the Form D filings indicated that Wireline intended to rely on the safe harbor in Rule 506(b) of Regulation D to exempt Wireline's offers and sales of securities from registration.

16. Wireline did not qualify for the exemption under Rule 506(b) because it offered and sold the investment contracts through a general solicitation. No other exemption was available to Wireline for its offering.

**Wireline Makes Materially False and Misleading Statements in the Securities Offering**

17. During the Offering, Wireline typically provided prospective investors with written marketing materials, including a token fact sheet, an investor slide deck, a white paper, and a technical design paper.

18. The marketing materials were repurposed from documents created by the predecessor entity and supplemented by individuals who lacked direct knowledge of Wireline's development status. Wireline had no policies or procedures to ensure that the marketing materials were updated or corrected before they were disseminated to potential investors in connection with the securities offerings. As a result, the materials included a number of false and misleading statements about the viability of Wireline's platform and the timetable for issuance of the tokens.

19. Wireline's marketing materials included a number of statements that were carried over from the materials originally created by its predecessor. These statements failed accurately to

describe the development status of Wireline's platform. For example, Wireline's investor deck stated that Wireline "ha[d] been running a private beta for 9 months" and that "[o]ver 100 developers [were] publishing apps to marketplace." It also stated that "[a]nchor customers [were] using solution in production." These statements created the false and misleading impression that Wireline had developed a functioning, feature-complete prototype on which numerous third-party developers were actively testing and utilizing all aspects of the redesigned platform.

20. Wireline's marketing materials also included evolving and misleading representations about the planned token distribution date that misrepresented the project's maturity. The marketing materials initially claimed that Wireline planned to distribute the tokens in late 2017, and then in January 2018, Wireline's marketing materials that were disseminated still stated that the tokens would be distributed in February 2018 or by the end of March 2018. In February 2018, Wireline told investors that the tokens would be issued in the second quarter of 2018.

21. Taken together, these statements indicated that Wireline's platform was functional and that its public release was imminent when in fact, the redesign was still ongoing. At the time of the Offering, Wireline's platform was not fully operational – the underlying programming for the platform was still being developed; developers were not actively providing microservices for users through a Wireline marketplace; the token had not been fully designed; and there was no platform to facilitate payments between developers and end-users using Wireline's digital tokens.

22. The misrepresentations were material to investors. For example, one prominent prospective investor backed out of a planned investment after learning that Wireline's token and platform development were less mature than the marketing materials suggested.

23. Wireline has since implemented a disclosure process to ensure that its statements or other disclosures are accurate and not misleading.

24. Wireline has since changed its original plan. It has spent substantially all of the money it raised on expenses associated with developing its platform and has not generated any revenue since inception.

**Violations**

25. Section 5(a) of the Securities Act states that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. Wireline violated Section 5(a) when it sold investment contracts without a registration statement being in effect.

26. Section 5(c) of the Securities Act states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such

security. Wireline violated Section 5(c) of the Securities Act when it offered to investors the opportunity to purchase an investment contract without a registration statement being filed.

27. Section 17(a)(2) proscribes obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." A violation of these provisions does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980). Wireline violated the foregoing provisions when it made materially false and misleading statements in the offer and sale of securities regarding the viability of its platform and the timetable for issuance of its tokens.

## **Undertakings**

28. Respondent has undertaken to, within ten days of the entry of this Order:

    A. Notify the 28 Investors, that as a result of the violations described herein, Wireline will not distribute tokens pursuant to the SAFTs; and

    B. Publish in a form not unacceptable to the Commission staff notice of this Order on Wireline's public website, www.wireline.io, and its social media channels.

29. Respondent shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to Anita B. Bandy, Associate Director, Division of Enforcement, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than thirty (30) days from the date of the completion of the undertakings.

30. Respondent may apply to the Commission staff for an extension of the deadlines set forth above before their expiration and, upon a showing of good cause by Respondent, the Commission staff may, in its sole discretion, grant such extensions for whatever time period it deems appropriate.

31. In determining whether to accept the Offer, the Commission has considered these undertakings, Wireline's current financial condition, and that the penalty represents a significant portion of Wireline's assets.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 8A of the Securities Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act.

B. Respondent shall, within 10 days of the entry of this Order, pay a civil penalty in the amount of $650,000 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717. Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Wireline as the Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita B. Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F Street N.E., Washington, DC 20549-6561A.

C. Respondent shall comply with the undertakings enumerated in Paragraphs 28 and 29 above.

D. Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalty referenced in paragraph B above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such

a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary